**Michael MORTON, d.b.a. Morton Manufacturing, Relator,**

v.

**COMMISSIONER OF JOBS AND TRAINING, Respondent.**

**No. C4-86-1973.**

Court of Appeals of Minnesota.

May 19, 1987.

Paul M. Tatone, Bloomington, for relator.

Hubert H. Humphrey, III, Atty. Gen., Donald E. Notvik, Spec. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by CRIPPEN, P.J., and WOZNIAK and MULALLY,* JJ.

## OPINION

EDWARD D. MULALLY, Acting Judge.

A Commissioner's representative from the Department of Jobs and Training determined that Michael Morton, d/b/a Morton Manufacturing, Inc., failed to timely notify the Department of his acquisition of a predecessor business. Consequently, Morton was held jointly and severally liable for his predecessor's debts to the Department. We affirm as modified.

## FACTS

In January 1986, relator Michael Morton, owner of Morton Manufacturing, entered into a purchase agreement with Donald

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Pepin, d/b/a Pepin Products, for the purchase of Pepin's equipment, assets and goodwill. The projected closing date was February 21, 1986, but the parties did not intend to close until Pepin's title was clear. Pepin owed state and federal taxes, and his business assets were subject to a mortgage held by the State Bank of Lake Elmo, Minnesota.

The parties closed in escrow on February 21, and Morton signed for a loan, which was to be disbursed when Pepin's tax liens were satisfied. The State Bank of Lake Elmo authorized Morton to use Pepin's mortgaged equipment, and on February 24, 1986, Morton began doing business on Pepin's premises.

On March 18, Morton signed Form DJT–13—a Report to Determine Liability issued by the Department of Jobs and Training—responding "no" to the following question:

> Did you purchase, lease or assume all or any part of the MN business of another business entity? * * *

On April 30, 1986, the Department mailed Morton a letter determining that he had "acquired all or part of the organization, trade, business or substantially all the assets of Pepin Products on February 21, 1986." The letter concluded that because Morton had not notified the Department within 30 days of such acquisition, he was being held jointly and severally liable for Pepin's debts to the Department pursuant to Minn.Stat. § 268.06, subd. 22(c). These debts totaled $2,233.15. The letter also stated that Morton was not a "successor" for purposes of transferring Pepin's employment experience record.

On May 6, Morton filed an appeal of this determination, claiming that he should not be liable for Pepin's debts to the Department because he was not a "successor" to Pepin. In the alternative, Morton claimed that he did file a timely "notification" of acquisition of the business when he submitted Form DJT–13. Morton did not claim entitlement to Pepin's employment experience record.

In late May or early June, the State Bank of Lake Elmo foreclosed on Pepin's mortgage and sold the equipment to Morton, effective July 15, 1986.

A referee from the Department of Jobs and Training found that Morton had submitted form DJT–13 to the Department, but that he had not reported the "acquisition of" or "succession to" Pepin's business or assets, as required by statute, and was therefore liable for Pepin's debts to the Department. The referee explained:

> The employer began his business in the same premises with the same equipment used by Pepin * * *. Even though Pepin's title was cloudy, the employer nevertheless obtained and has possessed Pepin's assets from late February, 1986. He was able to start his own business. He serves about 60% of Pepin's former customers. The equipment mortgage was not foreclosed until May or June of this year, and there was no evidence of foreclosures on the tax liens at any time.

The referee concluded that Morton acquired Pepin's trade or business or substantially all of his assets on February 21, 1986.

Morton appealed to a Commissioner's representative, who affirmed the referee's findings, but specifically concluded that on February 21 Morton acquired Pepin's business.

## ISSUES

1. Did Morton succeed to or acquire Pepin's business or substantially all of his assets?

2. Did Morton fail to timely notify the Department of such acquisition, thereby rendering himself jointly and severally liable for Pepin's debts to the Department?

## ANALYSIS

### I.

Minn.Stat. § 268.06, subd. 22 (1986), entitled "Employment Experience Record Transfer," provides in part:

> (a) When an employing unit succeeds to or acquires the organization, trade or business or substantially all the assets of another employing unit which at the time of the acquisition was an

employer subject to this law, and continues such organization, trade or business, the experience rating record of the predecessor employer shall be transferred as of the date of acquisition to the successor employer for the purpose of rate determination.

\* \* \* \* \* \*

(c) An employing unit which succeeds to or acquires the organization, trade or business or substantially all of the assets of an employer shall notify the Department in writing of the acquisition not later than 30 days after the acquisition. Failure to give notice shall render the predecessor and successor employing unit jointly and severally liable for contributions due and unpaid by the predecessor.

While the provisions regarding "successorship" in clauses (a) and (c) are nearly identical, clause (a) provides that a successor must "continue" the organization, trade or business in order to maintain a predecessor's experience rating. In *Easy Street West v. Commissioner Economic Security*, 345 N.W.2d 250 (Minn.Ct.App.1984), this court explained:

> Subd. 22 provides a two-tiered structure for determining treatment as a "successor" employer. If one acquires substantially all the assets of a particular business operation, then one reaches the first tier of successorship and can be held jointly liable for contributions due and not paid by one's predecessor. \* \* \* If, in addition, one then continues that same particular business operation, the second tier of successorship is achieved, and one assumes the predecessor's employment experience rating record for purposes of rate determination.
>
> \* \* \* \* \* \*
>
> [T]he second tier (continuation) requires that the successor business continue the fundamental character or identity of the predecessor's business. Mere purchase of the physical assets of the predecessor and use of the assets in the same kind of business are not sufficient to meet the second tier test and authorize

transfer of the predecessor's experience rating to the successor.

*Id.* at 254–55 (citation and footnote omitted). In determining whether continuation of the essential character of the business was demonstrated, the *Easy Street West* court looked to three factors: management, employees, and clientele. *Id.* at 255.

The *Easy Street West* analysis indicates that to reach the first tier (i.e. "succession" rendering Morton liable for Pepin's debts), the Department need only demonstrate that Morton acquired Pepin's business or substantially all of Pepin's physical assets. The Department need not also demonstrate that Morton continued Pepin's business, as would be required to meet the second tier (entitlement to Pepin's experience rating). Indeed, here the Department determined that Morton was not entitled to Pepin's experience rating.

In *Mid-America Festivals Corp. v. Commissioner of Economic Security*, 349 N.W.2d 270 (Minn.1984), where the issue again involved a predecessor's experience rating, the supreme court discussed the issue of acquisition or succession to a predecessor's business or assets (characterized by *Easy Street West* as the first tier). The *Mid-America* court stated:

> There are many factors which may be examined to discern whether a business has succeeded to, or acquired, the organization, trade or business or substantially all the assets of another employing unit. Among them are whether the purported successor purchased, leased or assumed the (1) machinery and manufacturing equipment, (2) office equipment, (3) corporate name, (4) inventories, (5) covenant not to compete, (6) possession of premises, (7) goodwill, (8) work in progress, (9) patent rights, (10) licenses, (11) trademarks, (12) trade names, (13) technical data, (14) lists of customers, (15) sales correspondence, (16) books of accounts, and/or (17) employees.

*Id.* at 274 (citations omitted).

The Commissioner's representative in the present case did not examine all of these factors when determining that Morton was a "successor" to Pepin's business, and

therefore liable for Pepin's debts. Nevertheless, we believe the supreme court regarded these factors as guidelines only, which "may" be examined to ascertain whether Morton has acquired or succeeded to his predecessor's assets or business.

The Commissioner's representative found undisputed the fact that Morton desired and ultimately obtained Pepin's business. The representative affirmed the referee's findings that Morton took possession of Pepin's premises, began serving approximately 60% of Pepin's customers, and used and acquired Pepin's assets. The representative noted that while the contemplated sale had never actually taken place, Morton had finally obtained legal title to all of Pepin's equipment and assets. The representative found non-dispositive the fact that the bank had acted as a middleman, concluding that the substance, rather than the form of the transaction, should be determinative.

■ While we affirm the representative's conclusion, we do so on the grounds that Morton acquired substantially all of Pepin's assets. The representative found that Morton had obtained all of Pepin's assets, and the record reveals that Morton used and then purchased all of Pepin's manufacturing equipment. Exhibits attached to the Bill of Sale from the bank to Morton list numerous tools and other equipment. In addition, a letter to the Department from Morton's attorney states:

> This letter is to advise you I am the attorney representing Michael Morton in his purchase of the equipment and assets of Pepin Engineering. Mr. Morton purchased the equipment, inventory, etc. on February 21, 1986.

This evidence demonstrates that, at the least, Morton acquired substantially all of Pepin's assets.

## II.

■ Morton clearly failed to notify the Department that he had acquired or succeeded to Pepin's business or that he had acquired substantially all of Pepin's assets. The Department requested that Morton indicate on Form DJT-13 whether he had

assumed even a part of another business; yet Morton replied "no." This misstatement cannot support a finding that Morton notified the Department of the acquisition.

### DECISION

We affirm the Commissioner's determination that Morton is jointly and severally liable to the Department for Pepin's debts. Morton acquired substantially all of Pepin's assets and failed to timely notify the Department of that acquisition.

Affirmed as modified.

CRIPPEN, J., dissents.

CRIPPEN, Judge, dissenting.

I respectfully dissent. The Commissioner engages here in a misapplication of statutory law, and it is important that this action be reversed.

As we observed three years ago, analysis of Minnesota Statutes § 268.06, subd. 22 (1986), requires examination of its history. *Easy Street West v. Commissioner of Economic Security*, 345 N.W.2d 250, 253 (Minn.Ct.App.1984).

The topic of subdivision 22 is "employment experience record transfer." This title has been repeated periodically by the legislature in the course of subdivision amendments. As we held in *Easy Street*, it is evident from its history that subdivision 22 is a law designed to shield the public from efforts of employers to obtain a low experience rating by means of buying out a business. *Id.* at 253–54. This ruling was adopted by the supreme court in *Mid-America Festivals Corp. v. Commissioner of Department of Economic Security*, 349 N.W.2d 270, 273–74 (Minn.1984).

The series of amendments to subdivision 22 have tightened its restrictions on transfer of experience ratings. In its present form, ratings transfers can occur only when (1) the new owner is a successor to business assets and (2) "continues" the same business operation, taking into account the management, the employees and the clientele of the old and new operations. *Easy Street*, 354 N.W.2d at 255. *See Mid-*

*America,* 349 N.W.2d at 274; Minn.Stat. § 268.06, subd. 22(a).

Given this history of the subdivision, both Minnesota appellate courts have barred use of the rating transfer law as a sword, attempts by the Commissioner to impose a higher experience rating on the new operator of a business. *Easy Street,* 345 N.W.2d 250; *Mid-America,* 349 N.W.2d 270. We complained in *Easy Street:*

> In 1984, when we are experiencing a recession of a magnitude such as has not occurred for over three decades, the Commissioner is attempting to use the language that was applicable for unfair attempts to secure a lower rate to now postulate that a successor employer, as long as he purchases substantially all of the assets of his predecessor and continues such organization, trade or business, is stuck with the predecessor's poor experience rating.
>
> The shield has become a sword against newly-formed small businesses.

*Easy Street,* 345 N.W.2d at 254.

Here, the Commissioner makes another sword-like use of subdivision 22. Here too, the target for the Commissioner's action is the small operator who purchases the assets of a financially troubled business. It is undisputed that he has properly refused to transfer an old experience rating to relator. Relator is entitled to this transfer only if he both "succeeds to or acquires" the old business and "continues" it. Minn. Stat. § 268.06, subd. 22(a). For rating transfer purposes, there is no succession of businesses here. However, the Commissioner concludes that there is succession for purposes of requiring an acquisition report and imposing on a nonreporting new operator the original owner's liability for unpaid unemployment compensation contributions. The action is taken with disregard for the potential injustice of saddling a new business operator with the requirement to pay another's debts.

Is the Commissioner's action sanctioned and invited by subdivision 22, subsection (c)? Not in my opinion. Again, it is necessary to look at the history of the statute.

Subsection (c) was enacted in 1975. 1975 Minn.Laws ch. 336, § 9. It demanded a notice evidently aimed at facilitating a purchaser's claim for transfer of an experience rating. The subsection provided a penalty (liability for unpaid employer contributions) for those who failed to furnish the notice. As we suggested in 1984, this subsection was among "formal and definite standards" on transfer procedure enacted in 1975, two years after the 1973 legislative decision to permit transfer determinations without a cumbersome procedure of special investigations on transfer questions. *Easy Street,* 345 N.W.2d at 253.

There is little question as to the meaning and effect of subsection (c) in the context of statutory law between 1975, when it was enacted, and 1979, when subsection (a) was further amended. During this four-year period, (1) a successor operator (one who "succeeds to or acquires the organization") was qualified, under subsection (a), for transfer of an experience rating; and (2) the successor operator (again, one who "succeeds to or acquires the organization") was subject, under subsection (c), to imposition of a penalty for failing to report on his acquisition. As originally enacted, subsection (c) merely facilitated application of the transfer addressed in subsection (a). Those who could get an old experience rating under subsection (a) were subject to a reporting obligation under subsection (c). Subsection (c) was an integral part of the subdivision on "employment experience record transfer."

It is evident that the concept of subdivision (c) was peculiar from the time of its enactment. As just noted, it affected only those who could get an old experience rating under subsection (a). Put in other words, those who were not eligible for a rating transfer were also free from the requirement for reporting, and the risk of a nonreporting penalty. The requirement for reporting, so limited to those who could take an old rating, did not serve well to facilitate reporting and decisionmaking aimed at determining whether purchasers were eligible or ineligible for an established rating. Such, however, was the law—there

was an identical definition of those who were eligible for taking an old rating and those who had to report.

In 1979, the Minnesota Legislature added the "continues" restriction to subsection (a). 1979 Minn.Laws ch. 181, § 7. Five years later, in *Easy Street*, we determined the significance of this restriction. Did this change in subsection (a) alter the meaning and the effect of subsection (c)? Not in my opinion.

We have found nothing in the 1979 enactment, and nothing in related legislative history, to suggest a decision of the legislature in 1979 to expand the reporting requirement of subsection (c) to buyers not eligible under subsection (a) for a transfer of experience ratings. There is no evidence of a design by the 1979 legislature to create a new contribution collection remedy— to transform a penalty clause, related to a reporting rule, into a contribution collection device. There is no justification for reading into the statutory shield of subdivision 22 an insidious sword.

It is contended that the Commissioner's action is permitted by our holding in *Easy Street*. We noted there, while attempting to highlight the new continuation requirement of subsection (a), that subsection (c) dealt with one criterion (succession) and subsection (a) dealt with two criteria (succession and continuation). *Easy Street*, 345 N.W.2d at 254. We noted that succession under subsection (c) involved the consequence of contribution liability. It is specious to consider these comments as authority on the issue in the immediate case. The observations were casual dicta, noted to aid in explaining a holding. The issue of the immediate case was not before the court in *Easy Street*, and there is no indication the question was anticipated or deliberately considered. Illustrative of the depth of study on the issue in 1984 is the fact that liability under subsection (c) was discussed without mention of the prior condition of a reporting violation.

We are asked here to collaborate with the Commissioner in creating authority permitting a new device for collection of unemployment compensation contributions from unwitting purchasers of small businesses. Assuming there is a shred of merit in the new process, only the legislature can properly make it part of our law.